UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MANUEL QUINTANILLA and
ZULMA QUINTANILLA,

                              Plaintiffs,          MEMORANDUM
                                                   OPINION AND ORDER

        -against-                                  CV 04-5227 (ETB)

KOMORI AMERICA CORPORATION,

                              Defendant.
------------------------------------------------------------------------X

        Before the court is the defendant's motion for summary judgment.  In support of its

motion, defendant asserts that plaintiff's expert witness, Paul Stehlik, is not qualified to serve as

an expert in this action and therefore his expert report should be stricken and he should be

precluded from testifying.  Should defendant's motion to disqualify Mr. Stehlik be granted,

defendant then argues that it is entitled to summary judgment because, without an expert witness,

plaintiff cannot establish a prima facie case of design defect and negligence on the part of

defendant.

Facts

        On June 13, 2002, the date of the accident at issue in this litigation, the plaintiff, Manuel

Quintanilla ("plaintiff"), was employed as a printing press operator for Levon Graphics, located

in East Farmingdale, New York.  (Am. Compl. ¶ 7.)  It is undisputed that plaintiff was injured

while working on June 13, 2002 when his hand came into contact with the moving rollers of a

Komori Lithrone 640 Printing Press, Serial No. 159 ("Komori Lithrone 640"), the printing press

that plaintiff was operating that day.  (56.1 Stmts. ¶¶ 1.)  It is also undisputed that the printing

-1-

press that plaintiff was operating  was manufactured by defendant Komori America Corporation's ("Komori America") parent company, Komori Printing Machinery Company, a Japanese corporation, (Id. ¶¶ 2), and first sold by defendant Komori America  in 1987.  (Id. ¶¶ 3.)  The cause of plaintiff's injury, however, is in dispute.

Plaintiff testified at his deposition that, at the time of his accident, he had approximately seven years experience as a printing press operator, first operating a Komori four tower, four color printing press and then the Komori Lithrone 640, a six tower, six color printing press. (Def. Ex. G, Transcript of the deposition of Manuel Quintanilla, at 22-24, 34.)  According to plaintiff, his employer, Levon Graphics, only provided him with two days of training on the Komori Lithrone 640.  Plaintiff did not receive any training directly from Komori, nor did plaintiff read the instruction manual for the Komori Lithrone 640.  (Id. at 35-36.)  Plaintiff was aware of, and testified that he did in fact read, the various warning labels affixed to the Komori Lithrone 640 prior to his accident on June 13, 2002.  (Id. at 38.)

Plaintiff testified in detail at his deposition concerning the events of June 13, 2002. According to plaintiff's testimony, while operating the printing press at issue that day, paper became caught in the machine causing the print job to come out "dirty."  (Id. at 65.)  Upon seeing this, the pressman that plaintiff was working with that day instructed him to clean out the machine completely, which plaintiff did.  (Id.)  However, when the pressman began to run the job again, it was still coming out "dirty."  (Id.)  Plaintiff thereafter began to clean the printing press unit again.  (Id.)  This process continued approximately two more times, with plaintiff bending down and straightening back up repeatedly to clean out the machine.  (Id.)  After what plaintiff testified was the fourth reiteration of this process, plaintiff stood up and put his hand on

what he thought was the bar but in fact was the roller of the printing press, which was still turning. (Id.) Since the printing press was still running, and the rollers were still turning, plaintiff's hand became caught between the two rollers and was injured. (Id.).

Plaintiff alleges that the Komori Lithrone 640 was defectively designed in that the machine is still fully operational when the barrier guard that blocks access to the rollers is in the open position. (Pl. Mem. of Law in Opp'n to Def. Motion for Summ. J., at 1.) According to plaintiff, the rollers are counter-rotating such that they create an in-running "nip point" where a person's hand, clothing or hair could easily be grabbed by the rollers, causing injury. (Id.) Plaintiff further alleges that his accident could have been fully preventable had defendant installed an "interlock"[1] on the printing press that would have stopped the rollers from moving when the barrier guard was open.[2] (Id. at 2.) Plaintiff also asserts that the printing press is defective because it was not equipped with a "nip point guard" - also known as a "nip guard"[3] - which would have allegedly prevented the plaintiff's hand from coming into contact with the in-running nip point created by the two rollers. (Id. at 2-3.)

In support of his claims, plaintiff offers the report of his expert witness, Paul Stehlik. In his report, Mr. Stehlik concluded that the lack of safety interlocks or nip point guards directly

---

[1] An interlock is a safety device that "would trip the [printing] press off if [the gate guarding the printing rollers] was open during operation." (Def. Ex. R, Transcript of the deposition of Douglas Schardt, at 14.)

[2] It appears that such an interlock was manufactured and sold by Komori America but was not purchased by plaintiff's employer, Levon Graphics. (Def. Ex. R, at 13-14, 44.)

[3] A "nip point guard" or a "nip guard," as defined by plaintiff's purported expert, is a "guard or barrier" that "covers the line of danger of an in going nip [point] between two rollers or rotating parts." (Pl. Ex. J, Transcript of the deposition of Paul Stehlik, at 69.) Komori America's representative, Doug Schardt, similarly described a "nip guard" as "a guard that is placed usually over an in-running nip between rollers or cylinders." (Def. Ex. R, at 19.)

caused the plaintiff's injury on June 13, 2002 and that had such safety features been present on the Komori Lithrone 640 printing press, plaintiff's accident would not have happened. (Def. Ex. L, Expert Report of Paul Stehlik, at 9.) Defendant now moves for summary judgment on the grounds that Mr. Stehlik is not qualified to testify regarding the matters at issue in the instant litigation and accordingly, should be precluded from doing so. Defendant therefore urges the court to disregard Mr. Stehlik's testimony in deciding its summary judgment motion, arguing that it is entitled to summary judgment on the grounds that plaintiff cannot establish a prima facie case of design defect or negligence without the aid of expert testimony.

Discussion

A.    <u>Standard for Summary Judgment</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>See</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The burden is on the moving party to establish the lack of any factual issues. <u>Id.</u> The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). The requirement is that there be no "genuine issue of material fact." <u>Id.</u> at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

-4-

574, 588 (1986). When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." Id. at 586. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248.

B.      Standard for Admitting Expert Testimony

Expert testimony must be evaluated in accordance with Federal Rule of Evidence 702, which states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 imposes a two-fold analysis on the trial court. First, the court must "make an initial determination as to whether the proposed witness qualifies as an expert." Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 352 (S.D.N.Y. 2003). If the court is satisfied that the proposed witness does indeed qualify as an expert, then the court "must inquire into whether the scientific, technical or other specialized testimony provided by that expert is both relevant and reliable. Id. at 352-53 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

The burden of establishing the admissibility of the proffered expert testimony weighs on the proponent of that testimony. See Baker, 254 F. Supp. 2d at 353. "Though the weight given

to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'" Id. (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)). Moreover, courts are not required to admit expert opinion evidence that is "connected to existing data only by the ipse dixit of the expert . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

C.    Admission of Stehlik's Proffered Expert Testimony

Defendant argues that Mr. Stehlik does not possess the requisite knowledge and experience to be qualified as an expert in the present case, and that, even if he were qualified, his testimony is unreliable and should be precluded. Accordingly, defendant asserts that the court should disregard Mr. Stehlik's testimony in deciding its summary judgment motion. See, e.g., Cacciola v. Selco Balers, Inc., 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) (stating that where expert testimony is excluded as inadmissible under Federal Rule of Evidence 702, "the summary judgment determination is made on a record that does not include that evidence").

1.    Stehlik's Qualifications

According to his curriculum vitae and his deposition testimony, Mr. Stehlik possesses both bachelor's and master's degrees in mechanical engineering. (Def. Ex. J, at 16-17, 23-24.) Mr. Stehlik is currently employed as a senior mechanical engineer for Transisto Devices, a company that designs and builds electronic power systems for the computer and telecommunications industry. (Id. at 4-6.) Mr. Stehlik has also owned his own consulting

practice for the last ten to fifteen years, consulting in various capacities, including building inspections, structural analyses, and thermal and stress analyses. (<u>Id.</u> at 6-7.) It also appears that Mr. Stehlik is a personal friend of the plaintiff's attorney, Victor Serby. As Mr. Stehlik testified, he and Mr. Serby once worked together at a company known as Airborne Instrument Labs during the early 1980's and have continued to maintain contact with one another since then. (<u>Id.</u> at 11.) Mr. Stehlik conceded at his deposition that he has never been employed in any position involving the design of machine guarding. Nor has he ever worked in any aspect of the printing industry. (<u>Id.</u> at 22-33.) Furthermore, Mr. Stehlik has never written any articles about printing presses or machine guarding, (<u>id.</u> at 43), nor has he taken or taught any courses with respect to printing or print shops. (<u>Id.</u> at 16, 40.) Mr. Stehlik has never designed or operated a printing press. Nor has he designed any guards or interlocks for printing presses. Similarly, he has never consulted or testified with respect to a printing press prior to this action and Mr. Stehlik has never been qualified as an expert in any court with respect to printing presses. (<u>Id.</u> at 34-35.) In fact, Mr. Stehlik's only prior experience with a printing press whatsoever was visiting his father at work in a commercial printing plant several times during the 1970's and as a tourist in the 1980's. (<u>Id.</u> at 33-34.)

Even Mr. Stehlik himself admits that he is not an expert in the printing industry. When asked at his deposition what he considered his major area of expertise as an engineer, Mr. Stehlik responded "mechanical design for the *electronics industry*." (<u>Id.</u> at 26) (emphasis added.) Moreover, when asked whether he considers himself an "expert with respect to the design and operation of printing presses," Mr. Stehlik responded "[n]ot printing presses specifically, but I consider myself knowledgeable in the workings of the design of machinery in general." (<u>Id.</u> at

36.)  In addition, when asked whether he had "made a study of the use of the [Komori Lithrone 640], Mr. Stehlik stated that he had read the operating manual and that he was "familiar with how the press is operated, not intimately because I don't work in the printing industry, but I have general knowledge of it."  (<u>Id.</u> at 61.)  Finally, when asked whether he considers himself an expert in the operations of a printing shop, Mr. Stehlik responded "[n]o, I am not" and further went on to concede that he has never held himself out as "an expert in the field of the operations of a printing shop or printing presses."  (<u>Id.</u> at 36.)

Mr. Stehlik lacks the requisite qualifications to testify in this action.  In an almost parallel case involving expert testimony with respect to a laundry pressing machine, and where the proposed expert similarly lacked any qualifications with respect to the field of expertise at issue, the court precluded the expert's testimony, finding that since the expert had never designed a machine of any kind and had never worked with laundry machines in any capacity "that bears on the conclusions he reaches in this case," he "lack[ed] the requisite qualifications and knowledge authorizing him to testify as an expert witness."  <u>Barban v. Rheem Textile Sys., Inc.</u>, No. 01-CV-8475, 2005 WL 387660, at *4 (E.D.N.Y. Feb. 11, 2005), <u>aff'd</u>, 147 Fed. Appx. 222 (2d Cir. 2005).  The court went on to hold that the expert's "lack of relevant experience and qualifications plainly conveys 'that whatever opinion he will ultimately express as to the cause of Plaintiff's accident 'would be imaginatively speculative.'"  <u>Id.</u> (quoting <u>Mannix v. Chrysler Corp.</u>, No. 97-CV-1944, 2001 WL 477291, at *1 (E.D.N.Y. Mar. 4, 2001) (precluding proposed expert testimony on summary judgment motion)).  The same can be said for Mr. Stehlik.  <u>See</u> <u>Trumps v. Toastmaster, Inc.</u>, 969 F. Supp. 247, 251-52 (S.D.N.Y. 1997) (holding that the proffered expert, a mechanical engineer, was not qualified to express an opinion on electrical

engineering, the subject at issue); <u>Rosen v. Tanning Loft</u>, 791 N.Y.S.2d 641, 643 (App. Div. 2005) (holding that plaintiff's expert was not qualified to testify because although he was an engineer, he had "no specialized knowledge, experience or training with regard to tanning equipment so as to qualify him as an expert in the area"); <u>Hong v. County of Nassau</u>, 527 N.Y.S.2d 66, 66 (App. Div. 1998) (affirming trial court's decision to exclude expert testimony where witness was a mechanical engineer but did not have any specialized knowledge with regard to the design or development of golf courses or any type of recreational area); <u>but</u> <u>see</u> <u>Lappe v. Am. Honda Motor Co., Inc.</u>, 857 F. Supp. 222, 226 (N.D.N.Y. 1994) ("In a product liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility.") (citation omitted).

 2.   <u>Stehlik's Testimony is Unreliable and Speculative</u>

 Even assuming <u>arguendo</u> that Mr. Stehlik did possess the requisite qualifications necessary to render an expert opinion in this case, a review of his proffered testimony reveals that his opinions are unreliable and speculative and, as such, inadmissible.

 As explained by the Supreme Court in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), there are several factors that a court may consider, in addition to those enunciated in Federal Rule of Evidence 702, when determining whether expert testimony is both relevant and reliable.  Such factors include:

> (1) whether a theory or technique has been or can be tested;
> (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific

community.

Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004) (quoting Daubert, 509 U.S. at 593-94) (internal quotation marks omitted).

In the instant action, Mr. Stehlik visited Levon Graphics to inspect the Komori Lithrone 640 on one occasion. (Def. Ex. J, at 53.) While there, Mr. Stehlik "took some measurements of the press; inspected the tower four where Mr. Quintanilla got injured," and "just looked over the general operation of the press." (Id. at 53-54.) Mr. Stehlik did not at any time reconstruct the events under which plaintiff was injured. (Id. at 55.) Nor did Mr. Stehlik speak with the plaintiff concerning his injury. Rather, he relied solely on the plaintiff's deposition testimony. (Id. at 124, 129.) Mr. Stehlik also chose not to speak with anyone from Levon Graphics or any of the employees who witnessed the plaintiff's injury. (Id. at 129-30.) As stated above, when asked at his deposition whether he had made a study of the use of the Komori Lithrone 640 in preparing his expert report, Mr. Stehlik testified that he read the operating manual and that he was "familiar with how the press is operated" but "not intimately because [he does not] work in the printing industry." (Id. at 61.) Mr. Stehlik went on to describe his level of understanding of the Komori Lithrone 640 as a "general knowledge." (Id.)

In spite of his apparent dearth of qualifications, Mr. Stehlik nevertheless opined that the Komori Lithrone 640 was defective because it did not contain either an interlock or a nip guard that would have prevented plaintiff's hand from becoming trapped between the rollers. According to Mr. Stehlik, a nip guard on the Komori Lithrone 640 would have made it very difficult for a person's hand to get trapped between the rollers and would not have hindered the servicing of the rollers. (Id. at 70-72, 74-75.) However, Mr. Stehlik conceded that he has never

seen a nip guard installed on a printing press, nor has he designed a nip guard for the printing press at issue in this action. (Id.) Moreover, Mr. Stehlik has not made any study as to whether installing such a nip guard would indeed provide a safer alternative or even be feasible so as not to undermine the utility of the machine. (Id.) "This is the touchstone of what an engineering expert in a design defect case should do." Barban, 2005 WL 387660, at *5 (citing Kass v. West Bend Co., 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004) ("[c]ourts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested for safety or utility"); see also Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000) ("The failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony."). Mr. Stehlik's failure to test his proposed alternative, namely placing a nip guard on the Komori Lithrone 640 to determine whether it would indeed provide a safer alternative and whether it would even be feasible so as not to impact the utility of the machine, leads to the conclusion that his opinion is based on nothing more than speculation.

With respect to the interlock, that Mr. Stehlik opines also could have prevented plaintiff's injury, Mr. Stehlik testified that such an interlock was available for the Komori Lithrone 640 and that Komori America representatives had visited Levon Graphics on more than one occasion to service the printing press and, therefore, could have installed the interlock on any number of occasions. (Def. Ex. J, at 82.) However, as with the nip guard, Mr. Stehlik has never even seen a Komori America interlock, let alone inspected it to determine the feasibility of it as compared to the machine's utility. (Id. at 83-84.) Nor has he even reviewed the blueprints of the interlock. (Id. at 87.) Moreover, Mr. Stehlik did not design any alternative type of interlock for the printing press that could be tested for safety and utility. (Id.) As with the nip guard, it appears

that Mr. Stehlik's expert opinion as to the alleged design defect of the Komori Lithrone 640 due to the absence of an interlock is nothing more than mere speculation.

The opinions that Mr. Stehlik would express if permitted to testify appear to rest on "unsubstantiated generalizations, speculative hypotheses and subjective evaluation that are based neither upon any professional study or experience-based observation." Cacciola, 127 F. Supp. 2d at 183 (granting motion to preclude expert testimony). As expressed by the Supreme Court in Daubert, the trial court functions as a "gatekeeper" with respect to the admission of expert testimony. See generally Daubert, 509 U.S. 579. In that function, the trial court must exclude testimony that "rest[s] unreliably on a foundation of sand." Cacciola, 127 F. Supp. 2d at 184.

3.      Cases Plaintiff Relies on

Plaintiff relies on only three cases to rebut defendant's assertion that Mr. Stehlik should be precluded from offering an expert opinion in this action, two of which concern experts in the medical field and do not appear relevant to the instant case. Plaintiff cites Gordon v. Tishman Constr. Corp., 694 N.Y.S.2d 719 (App. Div. 1999), and Beizer v. Schwartz, 789 N.Y.S.2d 724 (App. Div. 2005), in support of his contention that Mr. Stehlik does not need to possess specialized knowledge in the field of printing presses to be able to serve as an expert in this action, but rather the fact that he is a mechanical engineer is qualification enough. However, both Gordon and Beizer dealt with medical experts being permitted to testify on behalf of one party. Although the court in Gordon overruled the trial court's ruling that the proposed expert could not testify to the issue of alternative neurosurgical procedures that could have benefitted the plaintiff because, although he was a doctor, he was not a neurologist, the Appellate Court specifically stated that "[a] *physician* need not be a specialist in a particular field in order to be

considered a medical expert." Gordon, 694 N.Y.S.2d at 722 (emphasis added). There is no indication that this holding is meant to extend beyond the medical arena with respect to experts. Moreover, the proposed expert in Gordon, although not a neurosurgeon, was considered to have expertise in the area of neurology and rehabilitative medicine. See id. at 723. The same cannot be said of Mr. Stehlik. Although Mr. Stehlik is a mechanical engineer, he readily admits that he has no experience whatsoever in the printing industry or with printing presses. Even if the holding in Gordon were to extend beyond medical experts, the case is still inapposite in that while the expert in Gordon had experience in the field of neurology but did not hold the title of neurologist, the same is not true for Mr. Stehlik with respect to the printing industry.

Plaintiff fares no better with his reliance on Biezer. In Biezer, the proposed expert was a general dentist who was precluded from testifying by the trial court because he was not a periodontist, which was the field of expertise at issue in the case. See Biezer, 789 N.Y.S.2d at 725-26. The Appellate Division reversed the trial court's ruling; however, in that case, the proposed expert had in fact performed periodontal surgery in the past. See id. at 726. As with the expert in Gordon, the expert in Biezer did in fact possess knowledge and expertise in the field of expertise at issue. The same simply cannot be said for Mr. Stehlik with regard to the printing industry or printing presses.

Finally, plaintiff relies on a case very similar to the one at issue, so much so that the defendant is even the same. In Ramirez v. Komori Am. Corp., No. 94 CIV.3083, 1999 WL 187072, at *1 (S.D.N.Y. Apr. 6, 1999), the plaintiff, Jose Ramirez, brought suit against defendant Komori America for injuries he sustained to his hand while working on a Komori printing press, under theories of strict products liability and negligence. See id. at *1. While it

is true that plaintiff's expert was permitted to testify in <u>Ramirez</u>, unfortunately, there is no explanation provided in the opinion as to what the expert's qualifications were other than to say that his "area of expertise is appropriate for a design defect claim."  <u>Id.</u> at *4.  The opinion in that case does indicate, however, that plaintiff's expert possessed expertise "in the design and manufacture of the [printing press]" at issue.  <u>Id.</u>  Again, the same conclusion cannot be drawn with respect to Mr. Stehlik, who, by his own admission, has no experience whatsoever with respect to the design or manufacturing of printing presses.

Accordingly, the cases cited by plaintiff in support of his assertion that Mr. Stehlik is qualified to render an opinion on his behalf are simply not persuasive when compared to the abundance of case law in favor of precluding Mr. Stehlik.

For the foregoing reasons, the court grant's the defendant's motion to strike and to preclude Mr. Stehlik's testimony in this action.


D.    <u>Defendant's Motion for Summary Judgment</u>

Having ruled that plaintiff's proposed expert testimony is inadmissible, plaintiff "has no evidence to support his claim[s] that amounts to [any]thing more than that he was injured" while using a printing press manufactured by defendant.  <u>Mannix v. Chrysler Corp.</u>, No. 97-CV-1944, 2001 WL 477291, at *5 (E.D.N.Y. Mar. 4, 2001); <u>see</u> <u>also</u> <u>Brooks</u>, 234 F.3d at 92 (finding summary judgment proper where plaintiff's expert was excluded and thus plaintiff had no evidence in the record to support a claim for design defect); <u>Trumps</u>, 969 F. Supp. at 254 ("It follows from the exclusion of [plaintiff's expert's] opinion evidence that [defendant's] motion for summary judgment must be granted.").  However, for the sake of completion, the plaintiff's

substantive claims should be examined as well.

    1.      Negligence Standard

"Under New York law, an action sounding in negligence against a manufacturer will lie where a plaintiff can show that the manufacturer was responsible for a defect that caused an injury, and that the manufacturer could have foreseen the injury." Cacciola, 127 F. Supp. 2d at 185 (citing Robinson v. Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 480 (1980)). However, a manufacturer's duty does not extend so far that the manufacturer is required to "guarantee that no harm will to come to every user [of its product] no matter how careless or even reckless." Id. A manufacturer will be deemed to have satisfied its duty when the "product is marketed in a condition safe for the purposes for which it is intended or could reasonably be intended." Robinson, 49 N.Y.2d at 480-81.

    2.      Design Defect Standard

"A defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 107 (1983) (citation and quotation marks omitted). A cause of action for strict products liability design defect differs from a claim that a product was negligently designed in that the plaintiff is not required to prove that the manufacturer "acted unreasonably in designing the product." Id. Rather, the manufacturer is deemed liable regardless of his lack of actual knowledge of the unsafe condition of the product by virtue of his superior position to discover any design defects and correct them before making the product publicly available. See

id.

To establish a prima facie claim for design defect, the plaintiff is required to show: "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." Barban, 2005 WL 387660, at *8 (citing Voss, 59 N.Y.2d at 107-08 and Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 134-35 (2d Cir. 1999). With respect to the first two factors, plaintiff "is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." Voss, 59 N.Y.2d at 108. In response, the defendant may present evidence intended to demonstrate that the product is indeed safe - "that is, one whose utility outweighs its risks when the product has been designed so that the risks are reduced to the greatest extent possible while retaining the product's inherent usefulness at an acceptable cost." Id. "The ultimate issue is whether the product is reasonably safe, not whether it incorporated the safest possible features." Barban, 2005 WL 387660, at *8.[4] With respect to the third factor,

---

[4] To determine this issue, a number of factors may be taken into account, including:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product - that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

Voss, 59 N.Y.2d at 209 (citations omitted).

plaintiff must establish that the defective design was the proximate cause of plaintiff's injury.

See Robinson, 49 N.Y.2d at 479.[5]

     3.     Analysis of Plaintiff's Substantive Claims

     The inquiry in a design defect case is similar to that of a traditional negligence claim in that "an assessment of the manufacturer's conduct is virtually inevitable." Denny v. Ford Motor Co., 87 N.Y.2d 248, 258 (1995) (stating that "[i]n general, . . . the strict liability concept of 'defective design' [is] functionally synonymous with the earlier negligence concept of unreasonable designing") (alteration in original) (citation omitted). Accordingly, courts have often chosen to analyze negligence and strict liability design defect claims under a "single test." Barban, 2005 WL 387660, at *8. With respect to both negligence and design defect, plaintiff bears the burden of demonstrating that "(1) the product as designed posed a substantial likelihood of harm, (2) a feasible alternative existed, and (3) the defective design caused Plaintiff's injury." Id. (citing Kass v. The West Bend Co., No. 02-CV-3719, 2004 WL 2475606, at *12 (E.D.N.Y. Nov. 4, 2004) and Voss, 59 N.Y.2d at 107-08).

     As explained in further detail above, since plaintiff's expert is unqualified to offer an opinion in this action, the within motion - when decided without reference to the proffered expert opinion - is lacking in admissible evidence by plaintiff with respect to elements one, two and three. However, even if the Court were to consider Mr. Stehlik's opinions in rendering a decision, plaintiff still fails to establish the elements necessary to defeat defendant's motion for

---

     [5] It is possible for an accident to have "more than one proximate cause" and so, the test for strict products liability design defect comes down to whether defendant's alleged defective design can be shown to be a "substantial cause" of plaintiff's injury. Bush v. Lamb-Grays Co., 68 N.Y.S.2d 64, 67 (App. Div. 1998).

summary judgment.

With respect to element one, plaintiff is required to demonstrate that the printing press, as designed, posed a substantial likelihood of harm. Plaintiff attempts to do so through his expert's opinion that there was a "complete absence of safety interlocks and/or nip point guards" on the Komori Lithrone 640. (Def. Ex. L, at 4.) However, Komori America's representative, Doug Schardt, testified at his deposition that the printing press, as manufactured, was in fact equipped with a nip guard in that there was a barrier guard covering the entire roller train to prevent operators from inserting their hands into the revolving rollers. (Def. Ex. R, at 12.) According to Mr. Schardt, this barrier guard was "designed to guard all in-running nips." (Id. at 19-20.)

Plaintiff also attempts to establish a substantial likelihood of harm through his expert's opinion that the warning labels on the printing press were inadequate and, in particular, none of the labels were in Spanish, which is the plaintiff's native language. (Def. Ex. L, at 5, 8-9.) Plaintiff's expert further opined that because the warning labels that were affixed to the printing press were "exceptionally clean and free of the normal contaminants present in a printing press operation" and because Mr. Schardt testified that some of the warning labels present on the printing press were not of the type provided to Levon Graphics by Komori America, that such labels were placed on the printing press after plaintiff's accident. (Id. at 8.) However, plaintiff testified at his deposition that there were at least six labels present on the printing press prior to his accident, all of which indicated that operators should exercise caution when using the machinery. (Def. Ex. G, at 36-38.) Although the labels were in English, plaintiff testified that he did in fact read them and that he also understood them, although he could not remember exactly what they said. (Id.) After being shown a number of warning stickers at his deposition,

some of which were even in Spanish, and identifying which ones he had seen before, plaintiff then testified that he was unable to read all of the warning labels on the Komori Lithrone 640 prior to his accident because his employer, Levon Graphics, would not let him, but rather, would "rush" him back to work if he attempted to stop and read the warning stickers. (Id. at 45-49.) The plaintiff's testimony appears to negate Mr. Stehlik's opinion that the lack of adequate warning labels on the printing press posed a likelihood of substantial harm to press operators. Moreover, Mr. Stehlik even states in his own report that "it cannot be said with absolute certainty that adequate warning labels would have prevented Mr. Quintanilla's accident." (Def. Ex. L, at 9.) As such, plaintiff cannot demonstrate the first element of a design defect claim.

With respect to element two, although Mr. Stehlik opined that at least two feasible alternatives existed with respect to the Komori Lithrone 640, namely an interlock and a nip guard, as explained in detail above, he failed to conduct even a single study regarding his suggested alternative designs. See, e.g., Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000) (affirming district court's grant of summary judgment where expert failed to test his theory of causation and accordingly, was precluded from testifying); Fane v. Zimmer, Inc., 927 F.2d 124, 128 (2d Cir. 1991) (affirming summary judgment where plaintiffs failed to offer evidence of a feasible, safer alternative design); Barban, 2005 WL 387660, at *9 (granting summary judgment where plaintiff's expert failed to conduct a study regarding alternative designs and was ultimately precluded from offering an opinion). Accordingly, plaintiff has failed to establish the second element of a design defect claim.

Finally, with respect to element three, that the alleged design defect proximately caused plaintiff's injury, the plaintiff's own deposition demonstrates a likelihood that other factors

contributed to his accident, including the plaintiff's own conduct.  When asked about the

accident at issue herein at his deposition, plaintiff testified that while conducting a printing job,

the paper became caught in the rollers, requiring the unit to be cleaned so that the printing job

could be done properly.  (Def. Ex. G, at 65-67.)  Plaintiff further testified that he did not place

the machine in crawl mode before attempting to clean it.  (<u>Id.</u> at 67.)  Plaintiff explained that

after he attempted to clean the unit, the paper was still becoming caught and so he continued to

try and clean the unit by washing the rollers.  (<u>Id.</u> at 69-71.)  Plaintiff testified that the printing

press was still running at full speed when he attempted to wash the rollers.  (<u>Id.</u> at 69-70.)  As

plaintiff testified, the machine was never stopped at any point in between the paper becoming

caught and his accident so that the machine could be cleaned safely.  (<u>Id.</u> at 75.)

The plaintiff further testified that on the date of his injury, he was "getting tired" and that

his "legs were tired from having to bend over and get up again so many times."  (Def. Ex. G, at

66.)  Plaintiff went on to state as follows:

> After the fourth time of cleaning the machine, I could not stand it; as I
> stood up, I put my hand on a bar.  I thought it was a bar but it was the
> roller which was turning, the machine was running, my hand ended
> up in between the two rollers, my hand was completely caught.

(<u>Id.</u>)  In light of plaintiff's foregoing testimony that his own negligence may have played a

significant part in his accident, plaintiff is "unable to offer any proof that any alleged design

defect was the proximate cause of his injuries, no matter how serious and unfortunate they

were,"  <u>Barban</u>, 2005 WL 387660, at *9 (granting defendant summary judgment on plaintiff's

negligence and strict products liability design defect claims), and accordingly, cannot

demonstrate the third element of a design defect claim.

Based on the foregoing, the court finds that the defendant is entitled to summary

judgment on plaintiff's claims of negligence and strict products liability for design defect.

        4.      <u>Defendants are Insulated from Liability</u>

Summary judgment in defendant's favor is also necessary under <u>Scarangella v. Thomas Built Buses, Inc.</u>, 93 N.Y.2d 655 (1999) and its progeny, since the defendant manufacturer is insulated from liability for design defect. Although the traditional holding with respect to design defect has been that where "the manufacturer is in the best position to know the dangers inherent in its product . . . it is also in the best position to determine what safety devices should be employed," <u>Rosado v. Proctor & Schwartz</u>, 66 N.Y.2d 21, 26 (1985), this rationale is not applicable in all cases. Rather, in cases such as the instant one, where a plaintiff claims that a product without an optional safety feature is defectively designed because the safety equipment was not standard, the product will not be considered defective, and thus the manufacturer will not be held liable, where certain factors are met. <u>See</u> <u>Scarangella</u>, 93 N.Y.2d at 661. Specifically, where the evidence demonstrates that:

> (1) the buyer is thoroughly knowledgeable regarding the product
> and its use and is actually aware that the safety feature is available;
> (2) there exist normal circumstances of use in which the product is
> not unreasonably dangerous without the optional equipment; and
> (3) the buyer is in a position, given the range of uses of the product,
> to balance the benefits and the risks of not having the safety device
> in the specifically contemplated circumstances of *the buyer's* use
> of the product,

<u>id.</u> (emphasis in original), the product will not be found to be defective. "In such a case, the buyer, not the manufacturer, is in the superior position to make the risk-utility assessment, and a well-considered decision by the buyer to dispense with the optional safety equipment will excuse the manufacturer from liability." <u>Id.</u> If, however, the factors outlined above are not present, strict liability may be imposed on the manufacturer in accordance with traditional rationale. <u>See</u>

id.

Applying the foregoing factors to the case at hand, it appears that plaintiff cannot demonstrate a prima facie showing that the absence of a nip guard or an interlock on the Komori Lithrone 640 was a design defect.  First, it is reasonable to infer that Levon Graphics, plaintiff's employer, a printing and graphic design corporation and the owner of the Komori Lithrone 640, was a highly knowledgeable consumer.  In addition to owning the Komori Lithrone 640, Levon Graphics also owns a four-tower Komori printing press, as well as at least one other sophisticated printing press.[6]  (Def. Ex. G, at 22, 39.)  Levon Graphics has been in the printing business for almost twenty years.  See www.dos.state.ny.us (listing November 29, 1988 as the corporation's initial filing date with the New York Department of State).

There is evidence that Levon Graphics was aware that a retrofit interlock was available for purchase.  Doug Schardt, a product manager for defendant Komori America, testified in his deposition that Levon Graphics was offered as many as six safety enhancements for the Komori Lithrone 640 between 1996 and 1997, at least one of which involved an interlock that would have prevented the printing press from being able to run with the cover opened or removed and possibly prevented plaintiff's injury.  (Def. Ex. R, at 41-44.)  Mr. Schardt further testified that return receipt postcards obtained by Komori America indicate that Levon Graphics did in fact receive the information sent to them regarding these various safety enhancements.  (Id. at 65; Def. Ex. I.)  Levon Graphics, however, chose not to purchase any of the safety enhancements offered to them by Komori America.  (Def. Ex. R, at 44, 66-67.)  Moreover, plaintiff's own

---

[6] Although not specifically detailed in either party's motion papers, given the nature of its business, Levon Graphics presumably owns several other printing presses.

expert, Mr. Stehlik, conceded at his deposition that the defendant sent certified letters concerning various safety enhancements to Levon Graphics on at least nine separate occasions between 1996 and 2001, all of which were ignored. (Def. Ex. J, at 98-99; Am. Compl. ¶¶ 30-31.) Mr. Stehlik further testified that Levon Graphics was "unresponsive" with respect to the safety enhancements offered by Komori America and stated that Levon Graphics made "a choice whether or not to purchase the safety upgrades." (Def. Ex. J, at 100.) Even plaintiff acknowledges in his memorandum of law in opposition to plaintiff's motion for summary judgment that Levon Graphics was aware of the retrofit interlocking system that was available for the Komori Lithrone 640. (Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J., at 13.) It is undisputed that none of the safety enhancements offered by Komori were installed on the printing press that plaintiff was operating when he was injured. Accordingly, it appears that although they were offered various safety features on several occasions, at least one of which could have possibly prevented plaintiff's injury, Levon Graphics made the choice not to purchase them.

Second, there is also ample evidence to indicate that under normal circumstances of use, the Komori Lithrone 640 is not unreasonably dangerous without the optional retrofit interlock that Komori America offered. As Mr. Schardt, Komori America's representative, testified at his deposition, the printing press, as manufactured, was equipped with a barrier guard covering the entire roller train to prevent operators from inserting their hands into the revolving rollers. (Def. Ex. R, at 12.) Mr. Schardt stated that he considered the Komori Lithrone 640 to contain a nip guard when it was manufactured due to the presence of this barrier guard, which was "designed to guard all in-running nips." (Id. at 19-20.) Moreover, Mr. Schardt illustrated in his deposition

that there are various maintenance operations that can be safely performed on the Komori

Lithrone 640, regardless of the presence of an interlock, simply by placing the printing press in

"inch mode" or "crawl mode." (Id. at 17.) In such instances, the barrier guard would be open

while the rollers are still rotating, however "[t]he rollers rotating would be considered in inch

mode or crawl mode. In other words, they are not at high speed operation."[7] (Id.) Mr. Schardt

stated that an example of a maintenance operation in which this procedure would be utilized is

when the rollers need to be replaced. (Def. Ex. R, at 17.) As Mr. Schardt explained:

> When [the rollers] are replaced, they have to be in the correct pressure
> to each other. So what an operator will do is he installs the rollers, he
> will put a little bit of ink on them, inch the press around, meaning as
> long as his finger is on the button that controls the press going down, as
> long as he holds the button to press, the press will rotate up to 360
> degree revolution . . . So, one revolution of a roller. If he lets his
> finger up, it will stop.

(Id. at 17-18.) When asked whether there is any reason why "the operator would have to have

his hands in the vicinity of the roller while the machine is rotating," Mr. Schardt replied "[n]o."

(Id. at 18.)

Third, Levon Graphics was "in a position, given the range of uses of the product, to

balance the benefits and the risks of not having the safety device." Scarangella, 93

N.Y.2d at 661. It seems likely that only Levon Graphics knew how its press operators would be

trained with respect to the Komori Lithrone 640 and the conditions under which they would be

working. See Campos v. Crown Equip. Corp., 35 Fed. Appx. 31, 33 (2d Cir. 2002) (affirming

district court's finding that the plaintiff's employer was in the best position to balance the risks

---

[7] As plaintiff's expert described it, "inch mode" or "crawl mode" is "an operation mode
where a roller could be advanced or roller train could be advanced a short distance at a time by
holding down a button." (Def. Ex. J, at 122-23.)

and benefits of the safety options "'taking into account factors including the size of its warehouses, the number of workers, the number of forklifts, and the nature of the training it would offer to its employees who would operate its forklifts'") (quoting Campos v. Crown Equip. Corp., No. 01 Civ. 0174, 2001 U.S. Dist. LEXIS 24575, at *9 (S.D.N.Y. Aug. 31, 2001)); DiMaria v. Komatsu Forklift USA, Inc., No. CV 02 589, 2003 U.S. Dist. LEXIS 10550, at *11 (finding plaintiff's employer in the best position to balance the benefits and dangers of various safety devices given that the employer, and not the manufacturer, knew the conditions of the work area, how the forklifts would be used and how the workers who utilized the forklifts would be trained).

As explained in further detail above, defendant has submitted proof to bring the instant action within the three-factor analysis of Scarangella. The burden then shifts to plaintiff to raise a triable issue of fact with respect to defendant's evidence in order to survive summary judgment. Plaintiff has failed to meet this burden.

In his opposition to defendant's motion for summary judgment, plaintiff states that defendant's reliance on Scarangella is misplaced and that the facts of an earlier case, Rosado v. Proctor & Schwartz, 66 N.Y.2d 21 (1985), are more on point with the present action and should therefore control. (Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J., at 12.) Plaintiff is mistaken in his assertion that Rosado is "squarely on all fours with the facts of the instant case." (Id.) In Rosado, a manufacturer of a textile machine known as a garnett, which consisted of a "series of massive chains and pulleys that operate the gears and rollers which straighten [] [clumped] fiber[s] in the correct direction," sold the machine to plaintiff's employer completely lacking any safety devices. Rosado, 66 N.Y.2d at 22-23. Although the plaintiff's employer took

steps to install a mesh fence around the gear and pulley area, "there was a gap of two to three feet between the gate and the machine, and the gate had several broad doors[,]" which, when open, exposed all of the pulleys, chains and gears.  Id. at 23.  The gate contained only a simple latch, without any interlock, or other machine cutoff mechanism.  See id.  Accordingly, the garnett could be fully operative with the gate open and it was customary for the workers to operate it that way.  See id.

Due to the lack of safety devices on the garnett, the plaintiff in Rosado was subsequently injured while operating the machine, such that his hand came into contact with the chains and gears, causing his thumb and fingers to be severed.  See id.  Plaintiff thereafter commenced suit against the manufacturer of the garnett under a design defect theory of strict products liability.  See id.  The New York Court of Appeals held that where "the manufacturer is in the best position to know the dangers inherent in its product, and the dangers do not vary depending on jobsite, it is also in the best position to determine what safety devices should be employed" and found the manufacturer liable for plaintiff's injury.  Id. at 26.

While the facts of Rosado may seem to the plaintiff to be almost identical to the facts of the instant case, there is a major difference that the plaintiff fails to take into account.  In Rosado, the manufacturer never offered the plaintiff's employer the option to enhance the safety of the garnett.  Simply, no such safety upgrades were ever available for the plaintiff's employer to choose to install.  Here, Levon Graphics was offered various safety enhancements on numerous occasions by Komori America over a period of several years.  Levon Graphics made the choice not to purchase or install these safety enhancements.  Accordingly, the facts of this case differ from Rosado on quite a significant point.

Plaintiff also tries to distinguish <u>Scarangella</u> from the case at hand by asserting that Levon Graphics was not aware at the time that they purchased the Komori Lithrone 640 that an interlocking system was available, and that they only became aware of the interlock after owning the machine for several years. Although this may be true, the evidence presented indicates that the interlocking system simply was not available until after Levon Graphics owned the printing press for several years. However, once it was available, Komori notified Levon Graphics and offered them the option to install it. Levon Graphics chose not to do so. Moreover, <u>Scarangella</u> and its progeny do not state that the buyer must be aware at the time of purchase that one or more safety options are available. Rather, the test is whether the buyer simply has knowledge that such safety upgrades are indeed available prior to the accident, without reference to when such knowledge must be obtained. <u>See</u> <u>Scarangella</u>, 93 N.Y.2d at 661. Finally, plaintiff argues in his opposition that factors two and three of the <u>Scarangella</u> test are not met because the printing press had inherent dangers that did not vary depending on jobsite. (Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J., at 14.) However, plaintiff fails to explain how, by admissible evidence, these factors are not met and why the printing press should be deemed to have "inherent dangers." Plaintiff offers nothing more than conclusory statements by counsel.

Accordingly, plaintiff has failed to raise a triable issue of fact in connection with his claim that the absence of an interlock or a nip guard on the Komori Lithrone 640 was a design defect and defendant should be insulated from liability pursuant to the reasoning set forth in <u>Scarangella</u>.

<u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion for summary judgment is granted.  For the same reasons, plaintiff Zulma Quintanilla's claim for loss of consortium, as alleged in the Amended Complaint, is dismissed.

The Clerk of the Court is directed to enter judgment accordingly.


SO ORDERED.

Dated: Central Islip, New York
       May 4, 2007


/s/ E. Thomas Boyle_____
HON. E. THOMAS BOYLE
United State Magistrate Judge